ST. PAUL'S BENEVOLENT EDUCATIONAL AND MISSIONARY INSTITUTE, Providence of St. Joseph of the Capuchine Order and the National Council of Churches, Plaintiffs,

v.

The UNITED STATES of America, William Foege, Donald A. Berreth and J. Michael Lane, Defendants,

and

Abbott Laboratories and Mead Johnson & Company, Intervenors.

Civ. A. No. C 79–2047 A.

United States District Court,
N. D. Georgia,
Atlanta Division.

April 29, 1980.

Gerald F. Handley, Lokey & Bowden, Atlanta, Ga., for plaintiffs.

William Harper, U. S. Atty., Robert Castellani, Asst. U. S. Atty., Atlanta, Ga., for U. S.

Daryll Love and Allen S. C. Willingham, Powell, Goldstein, Frazier & Murphy, Atlanta, Ga., for Abbott Laboratories.

Arthur Howell, Jones, Bird & Howell, Atlanta, Ga., for Mead Johnson.

## ORDER

VINING, District Judge.

The controversy in this matter is the plaintiff's objection to the Center for Disease Control's (CDC) decision to disclose a computer tape and related tabulations to Abbott Laboratories and Mead Johnson & Company, pursuant to a request by these parties under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. (The plaintiffs originally filed their complaint against the United States and certain officers and employees of the CDC, but the above-named companies were subsequently permitted to intervene.) On November 8, 1979, the court issued a temporary restraining order preventing the CDC from disclosing to Abbott Laboratories and Mead Johnson & Company the materials which were requested by them under the FOIA, and with the consent of the parties this order remains in effect. On January 8, 1980, the court remanded the case to the CDC for the development of a record articulating the basis for its decision to release the requested materials. Following an administrative hearing, the hearing officer recommended that the requested materials be disclosed under the FOIA and the CDC adopted that recommendation as its decision. The expanded record is now before the court on Abbott Laboratories' motion to dissolve the TRO and for a denial of injunctive relief.

## BACKGROUND

The CDC is a federal government agency within the Department of Health and Human Resources. The plaintiffs are a group of non-profit, church-related organizations

that from the winter of 1977 to December 1, 1978, conducted a survey to gather data on the feeding of infants in low-income families in the United States to determine whether the feeding pattern could be correlated with morbidity and mortality and to find out whether particular marketing practices influence the choice of a particular feeding pattern. The findings were to provide the basis for a report concerning breast-fed and formula-fed infants. For that reason the survey concentrated on questions concerning what influenced the mother to choose either breast-feeding or bottle-feeding and other questions that were related to the growth and development patterns of the babies.

The data for this survey was gathered by the plaintiffs through the use of a questionnaire prepared by them. This questionnaire was developed solely by the plaintiffs; there was no government participation in its design or drafting. The collection of the data—that is, the actual interviewing of the low-income mothers—was also conducted by the plaintiffs with absolutely no government participation. Several predominately low-income areas within the country, both rural and urban, that had significant populations of a major ethnic or racial group, were selected for the survey. Trained individuals from the selected areas did the actual interviewing and data collection and sent the results to New York. Approximately 1,650 questionnaires were completed by the interviewers by December 1, 1978. All the work and funding for the completion of the questionnaires was contributed by the plaintiffs or other non-governmental sources and, indeed, there was no government connection with the project at this stage.

Dr. Milo Shannon-Thornberry, then located in New York, was the original coordinator of this project. In February 1979, he was in charge of completing the plaintiffs' survey project. At that time, the questionnaires had been completed but the following work remained to be done on the survey project:

a. Convert the data on the completed questionnaires to a computer tape;

b. Make certain statistical tabulations of the data on the resultant computer tape through the application of a computer program;

c. Make an analysis of the data so tabulated; and

d. Draft a report based upon the tabulated data, the computer tape, and the analysis thereof; and publish said report.

From the initiation of the project through the actual collection of the data, but before any contact with the CDC, Dr. Shannon-Thornberry devoted thousands of hours of his staff time for one and one-half years. Approximately 2,400 hours were devoted to the actual use of the questionnaires to collect the data.

The project came to Atlanta because Dr. Shannon-Thornberry decided to relocate from New York to Atlanta. The computer work still had to be done, and the CDC was chosen by Dr. Shannon-Thornberry to do that work essentially because he was then located in Atlanta. The CDC did not possess any special facilities or equipment that would have mandated its selection to perform the work that remained to be done.

The CDC agreed to assist the plaintiffs and perform the computer work requested. The original understanding with the CDC called for it to: convert the data on the completed questionnaire to a computer tape, make certain statistical tabulations of the data on the resultant computer tape through the application of computer programs, and make an analysis of the data so tabulated.

The CDC personnel involved with the project were employed in the agency's Bureau of Smallpox Eradication. The Director of the CDC's Bureau of Smallpox Eradication is John Michael Lane, a medical doctor. That Bureau has two divisions, a Nutrition Division and an Immunization Division. Milton Nichaman is a medical doctor and is the Director of the Nutrition Division. David C. Miller is a medical doctor and is a Medical Officer with the Nutrition Division.

One of the functions of the Nutrition Division of the CDC, and the CDC as a whole, is the collection, analysis, and distribution of data concerning the status of communicable diseases and nutrition of the United States population. The CDC creates some of the data it distributes, but the majority of the data is reported to the CDC by state and local government agencies. Some data is obtained from private parties. The data obtained by the CDC is distributed throughout the world to anyone requesting the data but primarily to public health agencies, physicians, universities, and private industry.

At the time of the plaintiffs' request for the CDC's help in completion of the survey project, Dr. Shannon-Thornberry delivered to the CDC personnel involved (Dr. Lane and Dr. Miller) 20 to 40 of the completed questionnaires. After reviewing these questionnaires, Dr. Lane agreed that the CDC, through the Nutrition Division, would provide the assistance described above. In exchange for the CDC's assistance, the CDC was to receive a copy of the computer tape produced (for its own internal use) and some infant weighing scales used by the plaintiffs in conducting the survey. (The receipt of these scales, however, was incidental to the CDC's agreement to help the plaintiffs and was not a factor in its decision to help them.) Also, it was understood that because the CDC was doing the analysis, the project could not draw conclusions that were contrary to its analysis.

One of the reasons behind the agency's agreement to help the plaintiffs was the CDC's consideration of the importance of infant and child nutrition relative to breast-feeding in the domestic and international scene. The CDC was aware that rapid changes in breast-feeding practices were occurring in the United States and good data did not exist about these practices. The CDC was also aware that there was a major conference sponsored by the World Health Organization of UNICEF that would occur in the fall of 1979. Government agencies, U.N. agencies, and private sector people would be involved in this conference. The CDC was, therefore, definitely interested in any data bearing on infant feeding practices in the United States.

The CDC had statistical expertise concerning the plaintiffs' type of questionnaires and existing computer programs that could be used to do a statistical analysis or tabulation of the data on the questionnaire once converted to a computer tape. Dr. Shannon-Thornberry had no prior experience or knowledge about such computer work at the time the CDC began the computer work.

On April 23, 1979, or sometime thereafter, it was agreed by the plaintiffs and the CDC that the CDC would not perform the analysis as originally agreed but, rather, would only convert the data on the plaintiffs' completed questionnaires to a computer tape and make certain statistical tabulations of the data on the resultant computer tape. This change in the original understanding was brought about by a press release issued in April 1979, which contained a reference to the CDC's computer work on this project. The CDC was displeased at the public mention of its participation in the project and, consequently, changed its participation so that it would not perform any analysis. Concomitantly, the CDC lost control over the conclusions that might be reached from an analysis of the data. Apparently, however, the CDC would still receive a copy of the data for its internal use, though no mention of this facet of the original understanding was ever discussed. As a result of this change in understanding the plaintiffs began making arrangements with other parties for the analysis needed to prepare their report.

Notwithstanding this change in their original agreement, *viz.*, that the CDC would no longer perform any analysis, the work of the CDC on the project in question entailed far greater than just mechanically transferring the questionnaire results onto a computer tape. Briefly, the CDC provided essentially the following services: advising Dr. Shannon-Thornberry, instructing him on how to prepare the questions for keypunching and statistical analysis (*i. e.,*

the actual code book), furnishing the key-punch personnel, and providing technical assistance by way of collecting errors (*i. e.,* editing the computer tapes). Dr. Lane estimated: "[T]hree months of CDC man time went into what I would call thinking rather than physical reduction of data to a computer tape." (*E. g.,* the thought that went into the code book versus actual keypunching.)

Although he was very concerned and apprehensive about the security of the data, Dr. Shannon-Thornberry has testified that he was unaware at the time of the original understanding with the CDC that there existed a possibility of release of the data pursuant to the FOIA. He also testified that had he been aware of the conceivable exposure of the project material (under the FOIA) prior to the plaintiffs' own report and publication he would not have left the data with the CDC.

Indeed, from the first communications between the plaintiffs and the CDC until May 1979, neither the plaintiffs nor the CDC considered that third parties might request under the FOIA any of the materials concerning the plaintiffs' project in the CDC's possession. The disclosure of these materials under the FOIA was not discussed until May 1979, when Dr. David Miller mentioned the possibility to Dr. Shannon-Thornberry. Dr. Shannon-Thornberry has no recollection of the conversation, but Dr. Miller's lucid recollection is that after the press release which mentioned the CDC's role in the project, he told Dr. Shannon-Thornberry that requests under the FOIA were "inevitably to be expected." Before May 1979, there were discussions between the plaintiffs and the CDC about the security of the plaintiffs' completed questionnaires while in the CDC's possession, but these discussions did not involve any consideration of an FOIA request for the computer tape containing the data from the questionnaires.

It was Dr. Shannon-Thornberry's understanding of the agreement that the two companies would get a copy of the computer tape, but only after the plaintiffs had published their report. (It has always been the plaintiffs' intention to release the data following their published report.) However, the CDC's understanding of the agreement was that the CDC would provide copies of the computer tape and tabulations to the requesting companies upon their completion by the CDC.

The CDC personnel hoped that they could give the computer tape and tabulation to the plaintiffs with some amount of lead time before producing them to the request companies, but it was always their understanding that they would have to provide copies of the computer tape and tabulations to the requesting companies before the World Health Organization meeting in October 1979. Furthermore, from the time of the agreement, the CDC personnel never considered that they would withhold the requested material until after the plaintiffs had published their report. Yet a letter dated August 21, 1979, which was written by Dr. Shannon-Thornberry and addressed to Dr. Lane and which was actually reviewed for accuracy by both Dr. Lane and Dr. Nichaman, expressed Dr. Shannon-Thornberry's understanding that no information was to be released to the two companies which had filed requests under the FOIA until after publication of the report by the plaintiffs. Neither of the doctors expressed any objection to this portion of the letter or questioned the accuracy of that representation of their understanding. However, both doctors now claim to have misinterpreted the meaning which Dr. Shannon-Thornberry attached to the language in that portion of the letter which referred to the completion of the report.

From May 1979, until September 20, 1979, neither the CDC nor the plaintiffs were aware of any disagreement between them concerning *when* the CDC would provide copies of the computer tape and tabulations to Abbott Laboratories and Mead Johnson & Company. By late September 1979, the CDC had produced a computer tape of the data contained on the questionnaires it received from the plaintiffs. The CDC had also produced certain tabulations of the

data contained on the computer tape. On September 20, 1979, the CDC notified the plaintiffs that the computer tapes and tabulations were about complete and that the CDC would produce copies of the tapes and tabulations to Abbott Laboratories and Mead Johnson & Company pursuant to their request under the FOIA.

On November 6, 1979, the plaintiffs filed their complaint against the United States and certain officers and employees of the CDC seeking an injunction to prevent the CDC from disclosing the computer tape and tabulations. On November 8, 1979, a temporary restraining order was entered restraining the CDC from disclosing to Abbott Laboratories and Mead Johnson & Company the records which were requested by them under the FOIA, and this order, with the consent of the parties, was continued by orders dated December 28, 1979, and January 8, 1980.

By the order dated January 8, 1980, the court directed that an administrative hearing be held with respect to the CDC's decision to disclose the above information, since an inadequate record had been generated by the CDC for the court to satisfactorily review the CDC's determination to release the information. Consequently, the court remanded the case to the CDC directing that the record be further developed to articulate the basis for the CDC's decision. *See Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), and *Dresser Industries, Inc. v. United States*, 596 F.2d 1231 (5th Cir. 1979). On February 1, 1980, an administrative hearing was held before a presiding officer appointed by the government to take evidence on the issues surrounding the CDC's decision to disclose the requested information. Upon completion of that hearing, a two volume transcript of the testimony was prepared, briefs were submitted and the presiding officer published his findings of fact, conclusions of law, and recommended decision, also permitting the parties to submit objections thereto before the recommendations were turned over to the CDC.

Upon receipt of the presiding officer's recommendations, the CDC issued its final decision in a letter to Mr. Gerald F. Handley (attorney for the plaintiffs), incorporating the entire record before this court and before the CDC. The final decision was an adoption of the hearing officer's recommendation: the materials should be disclosed under the FOIA. The expanded record is now before the court on Abbott Laboratories' motion to dissolve the temporary restraining order and for a denial of injunctive relief.

Presently, the questionnaires are in the possession of Dr. Shannon-Thornberry, since the CDC released that information to him once they were reduced to a computer tape. Those computer tapes, however, are still in the possession of the CDC, pursuant to an order of this court.

## ANALYSIS

■ The FOIA does not by its terms give the submitter of information to a federal agency any right to enjoin agency disclosure. *Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). Only a person seeking disclosure of information has a cause of action under 5 U.S.C. § 552; that does not mean, however, that a submitter is without a remedy, for a submitter may file a "reverse-FOIA" lawsuit when the agency has decided to disclose information that is either not encompassed by the FOIA, or for which the FOIA, though applicable, does not mandate disclosure, or when such disclosure would violate a non-disclosure statute. *See Chrysler Corp. v. Schlesinger*, 565 F.2d 1172 (3rd Cir. 1977), *vacated and remanded sub nom. Chrysler Corp. v. Brown, supra*.

■ Still, the plaintiffs' cause of action is strictly limited to their ability to seek review under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, and the scope of review under that Act is limited by section 706, which provides in pertinent part that a reviewing court shall

(2) hold unlawful and set aside agency action, findings and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Such a review is not a de novo proceeding; rather, the court must determine, based upon the record already in existence (as developed by the agency), whether that agency abused its discretion or acted "not in accordance with law." See Chrysler Corp. v. Brown, supra; Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); and Babcock & Wilcox Co. v. Rumsfeld, 70 F.R.D. 595 (N.D.Ohio 1976). Furthermore, "[t]he court is not empowered to substitute its judgment for that of the agency." 401 U.S. at 416, 91 S.Ct. at 824.

Before making its final decision to release the requested materials pursuant to the FOIA, the CDC followed proper procedures: it held a full hearing, took the recommendations of a disinterested hearing officer, and allowed the parties to present briefs and evidence and objections at each stage of the proceedings, all of which were considered by the CDC. The plaintiffs argue, however, that the hearing officer's recommendations were not in accordance with law for essentially the following two reasons: first, because the hearing officer's threshold determination, that the requested materials constitute "agency records" within the requirements of the FOIA, is erroneous; and second, because his finding that the data is not exempt from disclosure under exemption 4 of the FOIA, 5 U.S.C. § 552(b)(4), is erroneous. The court disagrees with the plaintiffs and concludes that Abbott Laboratories' motion to dissolve the TRO and deny injunctive relief should be granted, since the CDC has properly applied the law, and all of its essential findings of fact are supported by substantial evidence.

In regard to the threshold determination that the requested materials do constitute "agency records," the hearing officer correctly noted that no binding precedent existed; therefore, he turned to the two cases (then decided) most analogous to the facts of the case sub judice, Ciba-Geigy Corp. v. Mathews, 428 F.Supp. 523 (S.D.N.Y.1977), and Forsham v. Califano, 587 F.2d 1128 (D.C.Cir.1978), aff'd sub nom. Forsham v. Harris, 445 U.S. 169, 100 S.Ct. 978, 63 L.Ed.2d 293 (1980), and applied the dicta from those cases to the facts of this case.

■ In Ciba-Geigy, the court distilled the question of what is an "agency record," down to whether the records "are owned or controlled by the Government agency and thus used in the performance of its business." 428 F.Supp. at 529. In Forsham v. Califano, the court stated, "The governing principle is that only if a federal agency has created or obtained a record (or has a duty to obtain the record) in the course of doing its work, is there an agency record that can be demanded under FOIA." 587 F.2d at 1136. The hearing officer discussed the above language as well as additional language found in Ciba-Geigy, and Forsham v. Califano and concluded that the requested materials constitute "agency records." For the reasons given below, the court finds that the hearing officer's determination and, therefore, the CDC's adoption of his recommendation as its decision, is in "accordance with law."

The CDC had a significant involvement in the production of the requested materials and was to have for its own internal use a copy of the computer tape produced. While it is true that the plaintiffs did not contemplate the FOIA when they agreed that the CDC would keep a copy of the computer tape for itself, the hearing officer found, and the court agrees, that the CDC was to have its own copy nonetheless. The hearing officer also found that the CDC had not only possession, but an ownership interest and control of the computer tape (or its copy of the tape). More important, he determined that the computer tape possessed by the CDC contained information which could be used by the CDC, as stated by the Ciba-Geigy court, "in the course of its business" or, in the language of Forsham v. Califano, "in the course of doing its work."

Indeed, one of the primary functions of the CDC through its Nutrition Division (which was the division involved with the

plaintiffs' project) is the collection, analysis, and distribution of data concerning the status of nutrition of the United States population. The computer tape and related materials contain information which will directly enable the CDC to further that primary function. Hence, the court finds that the hearing officer's essential findings of fact are supported by the record and, thus, his threshold determination appears to be in accordance with law based on *Ciba-Geigy* and *Forsham v. Califano.*

The plaintiffs, however, point to dicta in two FOIA cases decided by the Supreme Court subsequent to the hearing officer's recommendation, *Forsham v. Harris,* 445 U.S. 169, 100 S.Ct. 978, 63 L.Ed.2d 293 (1980), and *Kissinger v. Reporters Committee for Freedom of the Press,* 445 U.S. 136, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980), to support their contention that the requested materials are not "agency records." However, those cases fail to further that contention and, in fact, serve to buttress the hearing officer's finding that the requested materials are "agency records."

In both *Kissinger* and *Forsham* the Court notes that mere physical location of materials alone is insufficient to render them "agency records" but that reliance or use may well be relevant to the question of whether a record in the possession of an agency is an "agency record." In *Forsham,* which has the more detailed discussion of what is an "agency record," the Court states, "Congress contemplated that an agency must first either create or obtain a record as a prerequisite to it becoming an 'agency record' within the meaning of the FOIA." 445 U.S. at 183, 100 S.Ct. at 986. The Court then recognizes that Congress, while supplying no definition of agency records in the FOIA, has formulated a definition of agency records contained in the Records Disposal Act (RDA), 44 U.S.C. § 3301 et seq., in effect at the time Congress enacted the FOIA, as the best indication of the definition to be applied under the FOIA. The RDA defines an agency record as materials made or received by an agency

which should be preserved (or is appropriate for preservation) by the agency "as evidence of the organization, *functions,* policies, decisions, procedures, operations or, other activities of the Government *or because of the informational value of data in them.*" (Emphasis added.)

The facts of the case *sub judice* reveal that the CDC did "create or obtain a record," which is now in its possession, and that it certainly may rely or use this record in the future because of the importance of the data contained therein to its involvement in nutritional work. By the same token, the requested materials must be found to constitute "agency records" under the definition expressed in the RDA. The data contains significant "informational value" because it relates to the CDC's nutritional work; therefore, the collection and possible use of the data also represents a "function" of the agency. As such, the requested materials come within the definition of agency records found in the RDA. Hence, the *Kissinger* and *Forsham* cases support the hearing officer's recommendation and, therefore, the CDC's adoption of his position. Consequently, the court finds that determination to be in accordance with law.

■ The plaintiffs also argue that the hearing officer erroneously found that the data is not exempt from disclosure under exemption 4 of the FOIA, 5 U.S.C. § 552(b)(4). Exemption 4 encompasses "trade secrets and commercial or financial information obtained from a person and privileged or confidential." The hearing officer found that the data in question did not fall within that exemption. The court agrees with that finding for the reasons given in the hearing officer's report, a copy of which is annexed as an appendix to this order.

### CONCLUSION

For the foregoing reasons the court finds that the decision of the CDC that the re-

quested materials should be disclosed pursuant to the FOIA is not arbitrary, capricious, nor an abuse of discretion, and further finds it to be in accordance with law. Consequently, the court hereby GRANTS Abbott Laboratories' motion to dissolve the Temporary Restraining Order and for a denial of injunctive relief.

## APPENDIX

*The requested computer tape and computer print-outs or tabulations of the data on the computer tape are not exempt from disclosure under FOIA, 5 U.S.C. § 552(b)(1)–(9), and are required to be disclosed. 5 U.S.C. § 552(a)(3).*

5 U.S.C. § 552(b)(1)–(9) lists the exclusive exemptions from the FOIA disclosure requirements. Only two of those exemptions could possibly have application to the requested material, § 552(b)(3) or (4).

Movant has argued that it has copyright protection to the requested materials. *FOIA* does not provide any specific exemption for copyrighted materials, nor does the copyright act meet the exemption standards under 5 U.S.C. § 552(b)(3). See *National Parks and Conservation Association v. Kleppe*, 178 U.S.App.D.C. 379, 547 F.2d 673 at 686 (D.C.Cir.1976); *MA Schapiro & Co. v. Securities and Exchange Commission*, 339 F.Supp. 467 (D.C.D.C.1972).

The remaining exemption possibly applicable is (b)(4) which states:

(b) This section does not apply to matters that are—

(4) trade secrets and commercial or financial information obtained from a person and privileged and confidential:

This exemption applies only to (1) trade secrets and (2) commercial or financial information which is privileged or confidential. There is no exemption for non-commercial or non-financial information which is privileged or confidential. *Washington Research Project, Inc. v. Department of Health, Education and Welfare*, 164 U.S.

App.D.C. 169, 504 F.2d 238, 244–45 (D.C.Cir. 1974) (scientific research); *Brockway v. Department of Air Force*, 518 F.2d 1184, 1188 (8th Cir. 1975) (witnesses statements about airplane crash); *Consumers Union v. Veterans Administration*, 301 F.Supp. 796 (S.D.N.Y.1969). See 1 Davis Ad.L.Treatise § 3A.19 (1970 Supp.).

Very clearly the information contained in the requested materials does not comprise a trade secret. Movant is not engaged in a trade or business, and the information does not give movant any competitive advantage. See, Restatement of Torts § 757. Similarly, the information has not been kept secret, nor is it intended to be kept secret. The information was disclosed to the CDC without sufficient safeguards to insure secrecy under the circumstances, and movant itself intends to disclose the information.

Finally, the information in the requested materials is not confidential, commercial or financial information. Movant does not argue that it is privileged. The information is certainly not financial, and movant is not engaged in any commercial enterprise. See, *Washington Research Project, Inc. v. Department of Health, Education and Welfare, supra.*

If the information were considered commercial, it is not confidential within the meaning of the exemption in the FOIA. The courts have held that information is confidential within the meaning of subsection (b)(4) only if disclosure of the information will "(1) impair the government's ability to obtain necessary information in the future or (2) cause substantial harm to the competitive position of the person from whom the information was obtained". *National Parks and Conservation Association v. Morton*, 498 F.2d 765 (D.C.Cir.1974).

These indicia of confidentiality are to be applied as an objective test, and the fact that the particular information would not ordinarily be disclosed to the public by the person from whom it was obtained does not control in determining whether the infor-

mation is confidential. 498 F.2d at 767. In this case, however, the particular information is intended for disclosure and would normally be disclosed. Movant's objection is to the time of disclosure. Additionally, a pledge of confidentiality by the receiving agency does not override the disclosure mandate of the FOIA. *Petkas v. Staats*, 163 U.S.App.D.C. 327, 501 F.2d 887, 889 (D.C.Cir.1974); *Ackerly v. Ley*, 420 F.2d 1336, 1339 n.3 (D.C.Cir.1969). "If it is not found to be confidential under the FOIA, it must be disclosed on request even if it was submitted in confidence." *Charles River Parks "A", Inc. v. Department of Housing and Urban Development*, 171 U.S.App.D.C. 286, 519 F.2d 935 (D.C.Cir.1975). No pledge of confidentiality from the receiving agency, however, was made to the movant.

For the foregoing reasons there is no applicable exemption under FOIA granting the CDC any discretion to withhold the requested materials, and they must be disclosed in accordance with the provisions of the FOIA, 5 U.S.C. § 552(a)(3).

### RECOMMENDATION

The requested materials must be disclosed in accordance with the provisions of the Freedom of Information Act, 5 U.S.C. § 552.

Submitted this _____ day of February, 1980.

DAVID R. TRIPPE
Presiding Officer