CREATIVE RESTAURANTS, INC., Johnco Restaurants, Inc., Daiquiri Works, Inc., and Beale Street Management, Inc., Plaintiffs/Appellants,

v.

CITY OF MEMPHIS, Defendant/Appellant.

MEMPHIS PUBLISHING COMPANY, doing business as the Commercial Appeal, and Dan Henderson, Plaintiffs/Appellees,

v.

BEALE STREET MANAGEMENT, INC., Beale Street Development Corporation, and the City of Memphis, Tennessee, Defendants/Appellants.

Court of Appeals of Tennessee, Western Section, at Jackson.

April 25, 1990.

Application for Permission to Appeal Denied by Supreme Court July 23, 1990.

Henry C. Shelton, III and William L. Gibbons of Goodman Glazer, Greener, Schneider, McQuiston & Kremer, P.C., Memphis, for appellants, Creative Restaurants, Inc., Johnco Restaurants, Inc., Daiquiri Works, Inc. and Beale Street Management, Inc.

Clifford D. Pierce, Jr., City Atty., and L. Kenneth McCowan, Asst. City Atty., Memphis, for appellant, City of Memphis.

S. Russell Headrick, Paul E. Prather, and Lucian T. Pera, Memphis, Bruce W. Sanford and Leonard H. Frieman of Baker & Hostetler, Washington, D.C., of counsel, for appellees, Memphis Pub. Co. and Dan Henderson.

TOMLIN, Presiding Judge (Western Section).

This case involves an appeal from a decree of the Chancery Court of Shelby County declaring that certain subleases in the possession of Beale Street Management, Inc. (hereafter "BSM") are subject to inspection under the Tennessee Public Records Act, T.C.A. § 10–7–501, et seq. The chancellor's decree also declared that copies of some of those same subleases in the possession of a part-time City Attorney for analysis are also subject to public inspection under the Act. The Chancery Court decree ordered the City of Memphis (hereafter "City") and BSM to permit Memphis Publishing Company (hereafter "MPC") and its agents to inspect and copy these subleases. BSM, three of its tenants under the subleases, and the City have appealed. Their appeal presents two issues: (1) Did the chancellor err in holding that subleases of city-owned property, in the possession of an Assistant City Attorney, are accessible under the provisions of the Public Records Act? (2) Are subleases of city-owned property in the possession of a corporation-for-profit acting as leasing agent for the City likewise accessible under said Act? We find no error on the part of the chancellor and affirm.

At issue in this case are subleases of real property owned by the City. Several square blocks of property on the south edge of downtown Memphis have been recognized for almost twenty-five years as the Beale Street Historic District. A substantial portion of the property was acquired by the City through a process known as "urban renewal." Done with federal funds, municipalities throughout the country in the '60's and '70's acquired blighted and substandard properties within their boundaries with the hope and intent of either restoring or removing the old buildings and thereafter disposing of the property by selling to private investors, thereby enhancing the physical appearance of the area in question, and enlarging the tax base. Insofar as Beale Street is concerned, it is recognized that this area has significant cultural and economic value to the City.

Without making any allocation as to the specific governmental entities, the record reflects that approximately $13 million in federal, state, county and city funds have been expended on Beale Street. Many of the buildings have been renovated and/or restored; public utilities have been installed and/or improved; streets, sidewalks and other public amenities have been built as well as parking facilities and public parks.

In order to carry out and promote the avowed purposes of the City in developing Beale Street into a viable entity, the Beale Street Development Corporation (hereafter "BSDC"), a private non-profit corporation, was formed in 1972 by interested citizens.

On November 29, 1982, in what might be described as a two-faceted transaction, the City executed a lengthy document entitled "Lease Agreement" between it and BSDC. At the same time, BSDC entered into an agreement entitled "Sub–Lease Agreement" with Elkington and Keltner Properties, Inc. (E & K), later to be known as Beale Street Management, Inc. (BSM). The sublease agreement between BSDC and E & K was contemplated and provided for in the lease between the City and BSDC, which described E & K as "a firm possessing certain expertise in capital development, property development and management essential to the development of the Beale Street Area." The lease between City and BSDC provides that the City would furnish funds obtained from the State of Tennessee, community block grants and the Economic Development Agency for the Development of Beale Street. The base lease provides that after consulting with BSDC and E & K, the City, in its sole discretion, would dictate how the funds would be utilized in the development of Beale Street.

The City–BSDC lease provides that all sublessees would be required to pay their pro rata cost of common-area maintenance and insurance carried by BSDC and E & K. In addition, BSDC was to have access to 3,000 square feet of space for $1.00–per-year rental. Under the base lease BSDC agrees to pay the City an amount equal to

the gross rental income on the property, less an amount equal to one-twelfth of the annual budget for BSDC, with a cap of $15,000 per month. The term of the lease between City and BSDC is for thirty-two years, with two ten-year options.

The sublease between BSDC and E & K (hereafter "BSM") substantially tracks the base lease between City and BSDC. Practically all, if not all, of what might be labeled "boiler-plate" provisions of the sublease are identical to the relevant provisions in the base lease. The term of the sublease is thirty-one years and eleven months, one month less than the term of the base lease.

The rental provision states that BSM is to pay BSDC the entire gross rental it receives from the sublessees, less ten and one-half percent of the gross rent; one-half of estimated expenses (all direct operating costs), plus five percent leasing commission to BSM; unpaid expenses advanced by BSM for management purposes; one-third of all revenue received by BSM from parking; plus an amount to cover all expenses incurred by BSM in furtherance of the development of Beale Street, including travel, phone, market studies, surveys and professional and legal fees, not to exceed $100,-000 per year.

It should also be noted that the sublease between BSDC and BSM states in substance that by the agreements E & K (BSM) agrees that so long as the City is not in default, E & K (BSM) will attorn and shall recognize the City as the landlord under its Sub-lease with BSDC.

Over the course of the next several years following the execution of these lease and sublease agreements, BSM undertook to develop various pieces of property in the Beale Street Historic District through leasing and management. At the trial below there was testimony by an officer of BSM to the effect that there were some thirty-four leases outstanding between BSM and various tenants. In addition, there were

numerous other subleases that had been entered into between BSM and tenants which for various reasons were no longer current and valid leases.

In 1987, Brad Foster, an attorney in private practice but under contract with the City as an Assistant City Attorney, was requested to advise the City's Division of Housing and Community Development (HCD), an agency of the City that oversaw the City's interest in the Beale Street Historic District. Foster was instructed by the Director of HCD to obtain copies of tenant subleases from BSM for the purpose of making an analysis and study of them, with his report to be filed with the Director. Several months later the City advised Foster that he was not to carry out this analysis. As a result, no analysis was ever made. However, copies of the tenant subleases remained in Foster's possession in his law office.

In 1989, MPC, through its authorized representatives, made both oral and written requests of BSM and Foster for access to the subleases pursuant to the Tennessee Open Records Act. BSM declined. The City advised Foster to make the copies of the subleases in his possession available for inspection by MPC, at the same time advising BSM of its position.[1] Officials of BSM in turn consulted with certain subtenants. Before Foster could carry out the City's request, three subtenants and BSM filed an action in chancery court seeking a declaratory judgment to the effect that the Public Records Act was not applicable to copies of the subleases in Foster's possession. They obtained a temporary restraining order against the City preventing Foster from disclosing the subleases. A few hours thereafter MPC filed its Petition for Access to Inspect all lease and sublease agreements between BSM and its subtenants. The two suits were subsequently consolidated for hearing and disposition.

At the trial below the chancellor heard testimony by deposition from Greg M.

1. By the time of the hearing the City changed its position as to the availability of the subleases in the possession of Foster, contending that they were not available as they were not public

records. The City stated that its earlier position was based upon a "desire to cooperate," not an admission that the subleases were public records.

Duckett, Director of the Division of Housing and Community Development; Rev. James Smith, President of BSDC; Brad Foster III, Assistant City Attorney; John Owen, Assistant Manager of Public Improvements for the City; Joseph Sabatini and John E. Elkington, officials of BSM.

After a full hearing, the chancellor dismissed the suit filed against the City by BSM and three subtenants, at the same time dissolving the temporary restraining order. Furthermore, the court declared that MPC should have access to the leases in question. In his ruling, the chancellor found as a fact that BSM was in effect a leasing agent for the City of Memphis and that as such, it dealt with property owned by the City. Judgment was entered in the trial court declaring that the tenant subleases in the possession of BSM and Assistant City Attorney Brad Foster III were public records subject to inspection, pursuant to T.C.A. § 10–7–503, and copying, pursuant to T.C.A. § 10–7–506.

Inasmuch as this case was tried by the court below sitting without a jury, we consider this appeal *de novo* upon the record in the trial court, which comes to us with a presumption of correctness as to the findings of fact of that court. Unless the evidence preponderates against these findings, absent an error of law, we must affirm. Rule 13(d), T.R.A.P.

## I.  ARE THESE PUBLIC RECORDS?

■ Both the City and BSM and its subtenant allies contend that the subleases sought by MPC do not constitute "public records" as defined in Part 1 of Chapter VII, *Public Records*, T.C.A. In its brief, the City flatly states that "[t]he term 'record' for Open Records Act purposes is defined in Tenn.Code Ann. § 10–7–101." This section, enacted in 1879, states:

> **"Records" construed.**—The term "records," as used in this chapter, shall be construed to mean any records of the county legislative body and common law, circuit, criminal, or chancery court, the register's books, the surveyor's and entry taker's book, and all other public

records, required by law to be kept in the several courts of this state.

The City proceeds to argue that "[s]ince the Beale Street Historic District tenants' leases are not 'records' under Section 10–7–101, they therefore cannot be 'municipal records' so as to be subject to public disclosure under Section 10–7–503."

We respectfully state that this argument is without merit. Taking this position several steps further, if § 10–7–101 governs what is to be considered a public record under § 10–7–502, et seq., then no municipal records would be subject to the Open Records Act, and no county or state records other than land and trial court records would be subject to public inspection. As pointed out by MPC in its brief, if this were the case, then all of the published Open Record Act cases that have been decided by the appellate courts of this state whereby access was granted have been wrongly decided. This Court would venture to say that the above observation would apply to all unreported cases as well.

T.C.A. § 10–7–503(a) (1987) provides as follows:

> All state, county and municipal records and all records maintained by the Tennessee performing arts center management corporation shall at all times, during business hours, be open for personal inspection by any citizen of Tennessee, and those in charge of such records shall not refuse such right of inspection to any citizen, unless otherwise provided by state statutes.

Clearly, the General Assembly did not have § 10–7–101 in mind when it enacted § 10–7–503(a). Furthermore, § 10–7–101 is made to look more inapplicable when you consider that portion of § 10–7–505(d) stating that "this section shall be broadly construed so as to give the fullest possible public access to public records."

MPC aptly states that the logical and obvious explanation of the inclusion of § 10–7–101 as a part of that chapter is a compiler's error, occurring in the renumbering of the 1980 edition of the Code. Prior to that time, what is now Part 1 of Chapter 7 was treated as a separate chap-

ter—Chapter 1. We accordingly hold that the lease agreements between BSM and the tenants on Beale Street are not excluded from public access by § 10-7-101.

## II. LEASES IN THE POSSESSION OF BSM

### A. Background

Through the federal urban renewal program of the 1960's, the City found itself the owner of several parcels of real estate located near the downtown area. Perhaps the most common practice following taking possession of the land was to clear it of the improvements located thereon and then to sell the vacant land for new construction of a nature and type compatible with the neighborhood. Thus, the area was renewed and revitalized, giving the City an improved tax base.

This Court can certainly take judicial notice of the fact that Beale Street in times past enjoyed a cultural and historical reputation nationwide. Over the years the Beale Street neighborhood changed. Many of the properties were allowed to decline into a state of disrepair by their respective owners. It was felt to be in the City's best interest if Beale Street could be restored physically and culturally to its former status. The Beale Street Historic District was later created.

Sometime about 1973, a non-profit corporation, BSDC, was formed by interested citizens for the purpose of promoting the development of Beale Street. On occasion the City leased portions of property within the Beale Street Historic District to individual tenants.

For reasons best known to City, in 1982 it decided to take a different approach in attempting to develop Beale Street, resulting in the lease/sublease arrangement with BSDC and BSM.

The Rev. James Smith, president of BSDC, testified in his deposition that he became president in 1982. While he declared that the function of BSDC was to redevelop Beale Street, he stated that (a) BSDC at that time had no office; (b) it had only an acting director; (c) he was not aware of the location of the corporate records, minutes and books; (d) BSDC did not have in its possession any copies of the subleases entered into by BSM with subtenants on Beale Street; (e) as of the date of his deposition—August 16, 1989—BSDC had received no rents from BSM in connection with the Beale Street properties; (f) BSDC had not submitted a budget to the City in the four or five years previous; and (g) it had made no report to the City reflecting that it had received no revenue from BSM. Smith confirmed that BSDC leased the property on Beale Street from the City and in turn subleased it to BSM, which was responsible for finding subtenants for the property and for managing the common areas. Smith further confirmed that neither BSDC nor BSM was obligated under the lease or sublease to occupy space on Beale Street. It is readily apparent that BSDC has played little or no role in the City's development efforts of Beale Street.

John Owen was designated as the City's representative to testify regarding the Beale Street project. He modestly testified that there was no one else employed by the City during the entire time the Beale Street Historic District had operated under the lease/sublease arrangement that knew any more about the project than he did. He acquired his knowledge in part by assuming the position of Assistant Manager of Public Improvements in 1981, which in part dealt with monitoring the activities of the Beale Street restoration project. Owen testified that the City of Memphis was responsible for the continued maintenance of the historic designation of Beale Street.

At the time the lease/sublease arrangements were entered into, Owen and his supervisor from time to time would be presented drafts of these agreements, whereupon they would examine them and make recommendations about language changes to their superiors. Owen was generally familiar with these two documents on a working basis. He testified that under the sublease from BSDC, BSM was in no way obligated to occupy any property on Beale Street, and that BSM's function

was to act as a leasing and management agent.

Owen further testified that during 1988, his office became more convinced of the necessity for a closer relationship with BSM. It was believed that the Division of Housing and Community Development (HCD) should have more and better information concerning budgets and leases. In that regard, Owen drafted a letter to Joe Sabatini, President of BSM, for the signature of Greg Duckett, Director of HCD. The letter read as follows:

> Re: Beale Street Historic District (Subtenant Leases)
>
> ....
>
> This is to advise you of the City's requirement to approve all future subleases within the demised premises of the Beale Street Historic District. All such subleases forwarded for approval will contain specific information regarding proposed rental credits toward leasehold improvements. This policy is effective immediately.
>
> Please develop and provide for the City's approval, not later than May 31, 1989, a standardized lease form to be utilized in all future subleases. Additionally, please provide by the above date, a copy of each active sublease within the demised premises, to include those with Supreme Mortgage, the Tennessee Valley Center, and Ronnie Grisanti. Should you not have the capability of copying this large volume of subleases, my staff can accomplish that. This action is being taken to provide a greater degree of continuity and efficiency as we strive to accomplish our mutual goals. If you have questions concerning this, please contact me.

Owen further testified that subsequent to writing this letter, the Division of HCD changed its position in part after BSM expressed reluctance to turn over copies of the subleases to the Office of HCD, because in their opinion, it would qualify the leases as public records, making them accessible to anyone. Owen voiced the opinion that if this were to happen, it would eliminate the competitive edge that BSM

might have in negotiating leases with tenants. He and Greg Duckett, the Director, solved what they perceived to be the problem by concluding that representatives of HCD would go to BSM's offices on Beale Street and there review the subleases rather than doing it at City Hall, thus circumventing the Open Records Act. This was confirmed in substance by the testimony of Duckett.

Without further proceeding with a review of the testimony in this record, it is readily apparent to this Court that the sum total effect of the lease/sublease arrangement between the City—BSDC/BSM—did nothing more than make BSDC a hollow conduit through which to pass a leasehold interest to a third party—BSM. BSM thus was appointed the leasing and management agent for the City in its attempt to recoup some of the taxpayers' money from the Beale Street Historic District. All of the evidence presented, along with some language in the November 29, 1982 agreement to the effect that so long as the City is not in default, E & K will attorn and shall recognize the City as the landlord under its sublease with BSDC provided more than adequate basis for the chancellor's finding that Beale Street Management is in effect a leasing agent for the City of Memphis and deals with property that is owned by the City. The evidence does not preponderate against this finding.

MPC has asserted in its brief that this arrangement was nothing more than a subterfuge to avoid the effects of the Tennessee Open Records Act. We cannot say what the motives of the parties were, nor is it material that we judge them. We are compelled to note, as has MPC, that none of the appellants has challenged this finding by the chancellor in this appeal.

**B. The Applicable Law**

■ Having determined that BSM is in fact the City's leasing agent for the Beale Street Historic District property owned by it, we must next characterize the nature of the documents being sought for inspection—copies of subleases between BSM and the various tenants on Beale Street. As

the City's leasing agent, BSM concluded these tenant subleases by causing the standard form lease previously approved by both legal and lay personnel for the City to be executed by the tenant and BSM with the original copies being retained by BSM. It is by and through these tenant subleases that the City hopes and expects to receive income from property owned by it and which it placed in the hands of BSM for subleasing purposes. While the parties have been placed in the posture of lessor and lessee insofar as legal terminology is concerned, they are substantially in the posture of principal and agent.

We hold that under the facts and circumstances reflected in the record, considering the liberality with which the Open Records Act is to be applied, and acknowledging the financial, cultural, historical and political interests that the City has in this property, the tenant subleases in the possession of BSM qualify as public records under the Act.

BSM and its subtenant allies contend nevertheless that BSM is a private, for-profit corporation, and that the subtenant leases under its control and within its possession are not and should not be subject to disclosure under the Act. It has already been stated that these tenant subleases convey a leasehold interest to the tenants in City property.

In holding that these tenant subleases are public records and that notwithstanding the fact that they are in the possession of BSM, a private corporation, they are subject to access and inspection under the Open Records Act, we rely upon several Tennessee cases that we consider to be more than adequate authority. The first is that of *Board of Education of Memphis City Schools v. Memphis Pub. Co.*, 585 S.W.2d 629 (Tenn.App.1979). In *Board of Education*, MPC sought access to the records of a search committee, made up of private citizens, appointed by the Board of Education of the City of Memphis, to screen applicants for the position of Superintendent of City Schools. This Court, in an opinion written by former Presiding Judge Nearn, now retired, held that the

personnel files of all applicants for the position of superintendent in the hands of the search committee were public records within the meaning of the Tennessee Open Records Law and were subject to access and review under that Act.

Sometime thereafter, in the case of *Memphis Publishing Co. v. Memphis State University*, 6 *Media L.Rep.* (BNA) § 2405 (Dec. 15, 1980), this Court held that a report filed with the university and prepared by an *ad hoc* committee appointed by the president of the university, but financed solely by private funds, constituted public records within the meaning of T.C.A. § 10-7-301(b) and was subject to access and inspection by the public.

In *Cleveland Newspapers, Inc. v. Bradley County Memorial Hospital Board of Directors*, 621 S.W.2d 763 (Tenn.App.1981), the Eastern Section of this Court reversed the holding of the trial court that hospital payroll records were exempt from inspection. This Court held that payroll records of the hospital were encompassed within the Tennessee Open Records Act. The hospital involved was created by a private act as a not-for-profit hospital. A subsequent private act provided for the operation, management and control of the hospital by a board of directors. The hospital sought to protect the payroll records of its personnel in compliance with requirements of the Joint Commission of Accreditation of Hospitals in order to retain accreditation. In so ruling, the *Cleveland Newspapers* court noted the substantial initial and ongoing financial relationship between Bradley County and the hospital.

**C. Documents in Foster's Possession**

■ While it may be assumed that the originals of all the tenant subleases are in the possession of BSM, we must yet dispose of the issue of whether or not the copies of the tenant subleases in the possession of Assistant City Attorney Foster are public records as decreed by the chancellor. Admittedly, Brad Foster is an attorney engaged in the private practice of law in Memphis. However, through his firm, he has been under contract with the

City as a part-time Assistant City Attorney for some thirteen years. Specifically, he has been assigned the legal responsibilities for the Division of Housing and Community Development, which in turn oversees the Beale Street Historic District. As already testified to, Greg Duckett is the Director of this Division.

█ Foster obtained copies of certain tenant subleases from BSM at the request of the former Director of the Division of HCD. At the same time he was requested to run an analysis on these leases to ascertain how well the City was faring. It should be noted that Foster acted as legal counsel for the City when the standard form leases were initially developed. There is no dispute that Foster received and kept these documents in the course and scope of his duties as attorney for the Division of HCD. The fact that he works in a private law office and retains the documents in private premises, as contended by the City, is immaterial. Under our case law, an attorney is his client's agent. *Winstead v. First Tennessee Bank N.A., Memphis,* 709 S.W.2d 627 (Tenn.App.1986). Again, we are of the opinion that *Board of Education v. Memphis Publishing Co., supra,* is the authority for holding that these documents were public records held by one in a public capacity.

We are also of the opinion that City's reliance upon the cases of *Hoffman v. Bay City School District,* 137 Mich.App. 333, 357 N.W.2d 686 (1984), and *Forsham v. Harris,* 445 U.S. 169, 100 S.Ct. 977, 63 L.Ed.2d 293 (1980) is misplaced. We say this for two reasons: First, the *Hoffman* court looked to *Forsham* because it could find no established precedent in the state of Michigan to which it could refer. As we have already noted, there is more than ample precedent in this state. Second, and of even more importance, is the fact that in *Hoffman* the plaintiff was trying to gain access through the Michigan Freedom of Information Act to the investigatory file, including a final report of an investigation undertaken by the attorney employed for that purpose by the public school board. The case under consideration would be similar to *Hoffman* if Foster had completed his analysis of the subtenant leases but had not submitted it to the City, and MPC thereafter sought access to Foster's report. The file sought to be inspected in *Hoffman* in essence was the work product of the attorney employed by the school board, not what was deemed to be public documents placed in his possession.

In addition, Greg Duckett, the Director of the City's Division of HCD, testified without contradiction that the copies of the leases in Foster's possession were subject to the Public Records Law and should be made available to MPC.

In affirming the chancellor, this Court would like to make it clear that it is not purporting to hold that under every set of circumstances, any time private documents get into the hands of a public agency or any time public documents come into the possession of a private individual or organization having some type of official connection with a governmental agency that they are subject to access and inspection under the Tennessee Open Records Act. We have decided this case based upon the specific facts and circumstances before us. Such an issue must be decided on a case-by-case basis.

We readily recognize that by opening these documents for inspection, the City, as a real estate developer, will lose some competitive edge by revealing to the public the terms and provisions of the various subtenant leases. This is not sufficient basis for carving out some type of exception. By this arrangement the City elected to enter the free enterprise marketplace and to become, as it were, a real estate developer. It elected on its own volition to take this route. It was not in any way compelled to do so. Having so elected, the City must be prepared to operate by the rules in the marketplace.

Perhaps it can be said that some type of confidentiality should be developed for governmental entities seeking to promote a project such as this. The writer has noted in the past that the Tennessee Open Records Act needs fine-tuning in certain respects. The writer also recognizes, how-

ever, that "Mr. Goodwrench" is the General Assembly, not the Court of Appeals.

The decree of the chancellor is affirmed in all respects. All costs on appeal will be taxed one-half to the City and one-half to BSM and the three subtenants. We will give the losing parties the benefit of the doubt in this case and thereby respectfully deny the request of MPC for the assessment of attorney fees. Execution may issue, if necessary, for the recovery of costs.

HIGHERS and FARMER, JJ., concur.