THE TENNESSEAN, a division of    )
Gannett Satellite Information Network,   )
Inc., and FRANK SUTHERLAND,    )
                                                             )
    Plaintiffs/Appellants,          )          Appeal No.
                                                             )          01-A-01-9606-CH-00255
VS.                                                        )
                                                             )          Davidson Chancery
ELECTRIC POWER BOARD OF         )          No. 96-323-II
NASHVILLE,                                       )
                                                             )
    Defendant/Appellee.            )

FILED

February 28, 1997

Cecil W. Crowson
Appellate Court Clerk

COURT OF APPEALS OF TENNESSEE
MIDDLE SECTION AT NASHVILLE

APPEALED FROM THE CHANCERY COURT OF DAVIDSON COUNTY
AT NASHVILLE, TENNESSEE

THE HONORABLE ELLEN HOBBS LYLE, CHANCELLOR


ALFRED H. KNIGHT
WILLIS & KNIGHT
215 Second Avenue, North
Nashville, Tennessee 37201
    Attorney for Plaintiffs/Defendants

LARRY STEWART
HENRY D. FINCHER
424 Church Street, Ste. 2800
Nashville, Tennessee 37219

EUGENE WARD
N.E.S. General Counsel
1214 Church Street
Nashville, Tennessee 37203
    Attorneys for Defendant/Appellee

FRANK S. KING, JR.
KING & BALLOW
1200 Noel Place
200 Fourth Avenue North
Nashville, Tennessee 37219
    Attorney for Tennessee Municipal Electric Power Association


AFFIRMED IN PART; REVERSED IN PART;
AND REMANDED


                      BEN H. CANTRELL, JUDGE

CONCUR:
LEWIS, J.
KOCH, J.

# O P I N I O N

This case arose out of the efforts of a Nashville newspaper, the Tennessean, to obtain from the Electric Power Board of Nashville the names, addresses, and telephone numbers of all Nashville Electric Service (NES) customers pursuant to the Tennessee Public Records Act. *See* Tenn. Code Ann. § 10-7-101 to 10-7-606 (1992 & Supp. 1996). The Chancery Court of Davidson County held that the information sought by the Tennessean was a public record and thus must be provided. However, the trial court concluded that NES had the right to charge the Tennessean $91,619.00 for the costs of producing this information and of notifying its customers of the Tennessean's request. The following issues are raised in this appeal:

1. Whether the information requested by the Tennessean is a record within the meaning of Tennessee's Public Records Act?

2. Whether a request pursuant to the Tennessee Public Records Act for a customer list may be conditioned upon payment for the costs of notifying the customers as a "reasonable rule governing the making of . . . copies"?

3. Whether the requirement for paying the costs has become moot in light of the fact that, subsequent to the trial court's judgement, NES voluntarily notified its customers of the Tennessean's request in a public affairs flyer inserted into NES' monthly bill?

After a careful review of the record, we reverse the decision of the trial court finding the requested information to be a record within the purview of Tennessee's Public Records Act. However, should the Tennessean access this information in a lawful manner, we affirm the trial court's decision upholding the costs associated with notifying NES customers of the access as reasonable under the statute.

I.

It is not disputed that NES does not have the information sought by the Tennessean in the form of a document with the names, addresses, and phone numbers of its 292,000 customers. In the chancery court, NES presented several witnesses who testified regarding the procedure which must be undertaken and the expenses that must be incurred in order to compile such a list from the records in the possession of NES.

Through the affidavit of Victor Hatridge, Vice President and Chief Information Officer for NES, the record establishes that NES installed an Interactive Voice Response system for the purpose of identifying premises with power outages. As a consequence, NES began actively soliciting the telephone numbers of its customers. NES now has approximately 90% of these numbers though it does not distinguish between unlisted or unpublished and listed or published phone numbers.

Mr. Hatridge stated that to his knowledge, NES does not have a list or data compilation which contains only the information requested by the Tennessean nor has NES ever needed such a list in order to conduct its business. He stated that after NES investigated whether it had a customer list including this information, the closest data compilation it found was a microfiche report that it generated monthly which includes the names and addresses of service meter locations. At this point, an NES employee faxed the Tennessean an estimate of $91,619. Approximately $5,500 of this amount was for the production of the list and the remainder was for the cost associated with notifying the customers in accordance with NES' notification policy.

In his affidavit, Mr. Hatridge testified that, after the estimate was sent to the Tennessean, he discovered that a Master Tape which NES generates on a weekly basis was also available. It contained the service location number, the meter number, the name of the customer responsible for paying for the service at the service location, the address corresponding to the location of the meter, a telephone number corresponding to the service location, the customer number, a critical health indicator,

and NES distribution system identifiers. Mr. Hatridge said the cost of computer time and materials to produce a copy of the Master Tape would be approximately $100.00. If NES were to modify the Master Tape so as to exclude data fields not requested by the Tennessean, the cost of writing a computer program to effectuate such an exclusion would be approximately $1,800.00.

NES also presented the affidavit of Wendell Wheeler an employee of Seltman, Cobb, & Bryant (SCB), the outsourcing contractor for all of NES' information systems. He said that his SCB does have a computer generated cumulative list containing the name of each active customer and the address of his or her electric meter. However, it does not contain telephone numbers or actual mailing addresses as there are approximately 60,000 mailing addresses which do not correspond to a service address. In his affidavit, Mr. Wheeler testified that in order to write and run a new program to add NES' customers' telephone numbers and mailing addresses to the existing format of the customer list, it would cost about $4,500 which would include $2,677 in programming costs and $1,828 in computer time. Mr. Wheeler was in accord with Mr. Hatridge that NES had never requested such a list and that there is no benefit to NES in having such a list.

NES' notification policy to which we have already alluded arose out of NES' concern for the privacy and, in some cases, the physical safety of its customers. NES introduced as an exhibit an article published in the Tennessean on October 25, 1994, regarding the murder of a confidential informant for the Nashville Police Department occurring hours before the victim was to give testimony against a convicted drug dealer. The article stated that the victim's mother had filed a lawsuit charging that NES was liable for her son's death because it had given someone the victim's address pursuant to public records law. Following this incident, NES adopted the records policy on December 21, 1994. This policy requires, in part, notification to

be sent to citizens whose personal NES account information has been accessed by an unauthorized third party.

In response to the Tennessean's suggestion that the customers be notified in *Power Notes* -- the monthly flyer inserted into the NES statement -- Teresa Corlew, NES's Director of Corporate Communications, explained NES's position on this type of notification as follows:

> [T]he purpose of "Power Notes" is to provide information to customers about NES programs and services and non-profit community events . . . . If NES allowed The Tennessean to use "Power Notes" for notification, all customers desiring information could request the same greatly reducing or eliminating the amount of space to be used for business purposes. In addition, it is NES' policy to notify customers via a first class letter because not all customers read "Power Notes."

Ms. Corlew then sent the above-mentioned estimate of the cost of providing the names, addresses and telephone numbers of the approximate 300,000 NES customers which was $91,619, $86,400[1] of which was the cost to notify the customers. At that time, there were actually 292,024 NES customers.

Following the appeal to this court, we granted the parties' motions to admit post-judgment facts. The Tennessean submitted the March 1996 issue of *Power Notes*, the first page of which contained an article which was entitled, "The Public Right To Know vs. Personal Privacy." The article began with the following statement: "The Tennessean requested every NES customer name, address and telephone number, including those numbers that are unlisted." It continued to discuss the Open Records Act and the trial court's decision determining that the requested information was a record.

---

[1]This cost included $82,200 for the cost to notify customers of the inquiry at a first class postage rate of 27.4 cents per mailing and $4,200 for the overtime cost of 3 mail room employees.

NES submitted the affidavit of Elaine Robinson, the employee of NES who is the official administrator of the NES Public Access and Notification Policy. She explained that the March 1996 issue of *Power Notes* was not designed to provide actual notice to customers that unauthorized third parties would be provided access to their account information nor did it accomplish such notice. Furthermore, Ms. Robinson explained, each issue of *Power Notes* costs NES $5,128 to print. She articulated the problems associated with notifying customers via *Power Notes* as follows:

> If N.E.S. is required to add a sheet to each mailing to notify its customers of unauthorized third party access to personal customer information, the estimated additional cost would approximately be $82,200, because the extra weight would force N.E.S. to pay additional postage in that amount (300,000 customers @ 27.4 cents each). Furthermore, N.E.S. does not currently have the capability to add an extra sheet. It would be forced to expend significant amounts to purchase machinery or contract with another firm who had the capability to process an additional sheet of information . . .

> Each issue of "Power Notes" routinely requires thirty (30) to sixty (60) days to draft, revise, print and mail. To ensure that each customer received his/her "Power Notes" prior to release of customer account information to unauthorized third parties, N.E.S. would have to delay issuance of requested public information until a full cycle of "Power Notes" had been distributed, which would delay release of information for sixty (60) days. N.E.S. has determined that this would not be in the best interests of compliance with the interests of the public.

In addition, Ms. Robinson stated in her affidavit that NES does not believe that all of its customers actually read *Power Notes*. In support of this belief, NES submitted, as a post-judgment fact, a letter printed on the editorial page of the March 28, 1996 issue of the Tennessean. The letter which was written by a dissatisfied NES customer carried the following title: "Bill is bad enough without the junk mail." The author expressed her opinion that "the Nashville Electric Service bill has become increasingly difficult to distinguish from ordinary junk mail" and suggested that "disgruntled customers . . . stuff those mailers in the return envelope along with [their] payment and let NES deal with them."

## II.

Turning to the issues raised by this appeal, we first address the question of whether or not the names, addresses, and phone numbers of NES customers sought by the Tennessean are indeed "records" within the contemplation of the Tennessee Public Records Act. *See* Tenn. Code Ann. § 10-7-101 to 10-7-606 (1992 & Supp. 1996). As it is not disputed that this information does not exist in the form requested, NES contends that the law can not be used to compel it to create a record which does not already exist. The Tennessean counters that the law requires the government to make available to the public information, not documents or printouts in document form. The Tennessean rejects that computer-stored information is accessible only in the format in which it is entered on the computer.

In order to resolve this matter, we look to the pertinent portions of the code. The statute upon which the Tennessean relies in order to obtain the information it wants is found in Tennessee Code Annotated § 10-7-503(a) and provides as follows:

> (a) All state, county and municipal records and all records maintained by the Tennessee performing arts center management corporation, except any public documents authorized to be destroyed by the county public records commission in accordance with § 10-7-404, shall at all times, during business hours, be open for personal inspection by any citizen of Tennessee, and those in charge of such records shall not refuse such right of inspection to any citizen, unless otherwise provided by state law.

*Id.* § 10-7-503(a) (Supp. 1996). The term "record" is defined in the Public Records Act in two separate places, under a section entitled, " 'Records' construed,"[2] *Id.* §10-7-101, and under the heading, "Definitions." *Id. §* 10-7-301(6). As for the

---

[2]The text of this section is as follows:

> "Records," as used in this part, shall be construed to mean any records of the county legislative body and common law, circuit, criminal, or chancery court, the register's books, the surveyor's and entry taker's book, and all other public records, required by law to be kept in the several courts of this state.

Tenn. Code Ann. § 10-7-101 (1992).

former, this court has held that it does not apply because it was included in chapter 7 of Title 10 by error. *Creative Restaurants, Inc. v. City of Memphis*, 795 S.W.2d 672, 675 (Tenn. App. 1990). Therefore, we look to the definition articulated in the "Definitions" section which reads as follows:

> (6) "Public record(s)" or "state record(s)" means all documents, papers, letters, maps, books, photographs, microfilms, electronic data processing files and output, films, sound recordings, or other material, regardless of physical form or characteristics made or received pursuant to law or ordinance or in connection with the transaction of official business by any governmental agency.

Tenn. Code Ann. § 10-7-301(6) (1992); *see Griffin v. City of Knoxville*, 821 S.W.2d 921, 923 (Tenn. 1991) (using this definition of public records to determine whether a deceased's handwritten notes were public records available for inspection by the public under § 10-7-503 of the Public Records Act).

As we review these statutes, we keep in mind several well-established rules. "The fundamental rule of statutory construction is to ascertain and, if possible, give effect to the intention or purpose of the legislature as expressed in the statute." *Memphis Publ'g Co. v. Holt*, 710 S.W.2d 513, 516 (Tenn. 1986) (citing *Worrall v. Kroger Co.*, 545 S.W.2d 736 (Tenn.1977)). Where a statute is unambiguous, this court must ascertain and give effect to the intention and purpose of the General Assembly as expressed in the four corners of the statute. *Gabel v. Lerma*, 812 S.W.2d 580, 582 (Tenn. App. 1990) (citing *Memphis Publ'g Co.*, 710 S.W.2d). In so doing, the words of the statute are to be given their natural and ordinary meaning, without a forced or subtle construction that would limit or extend the meaning of the language. *Tuggle v. Allright Parking Sys., Inc.*, 922 S.W.2d 105, 107 (Tenn. 1996) (citing *National Gas Distrib., Inc. v. State*, 804 S.W.2d 66 (Tenn. 1991)).

The statute opens up "records" to public inspection. Tenn. Code Ann. § 10-7-503(a). Records are "documents, papers, letters, maps, books, photographs,

microfilms, electronic data processing files and output, films, sound recordings" all of which indicate a compilation of information and are distinguishable from the information compiled therein. *Id.* § 10-7-301(6). The dictionary defines the noun "record" first as "[a]n account, as of information or facts, set down especially in writing as a means of preserving knowledge." *The American Heritage Dictionary* 1511 (3d. ed. 1992). A second definition is "[i]nformation or data on a particular subject collected and preserved." *Id.* Information, on the other hand, is defined as "[k]nowledge derived from study, experience, or instruction" or "a collection of facts of data." *Id.* at 927. It is clear that the natural and ordinary meaning of "record" contemplates information gathered or organized on a particular subject and in a particular format and not the information or data itself.

Appellants emphasize the portion of the statutory definition which states that records can be "other material, regardless of physical form or characteristics." Tenn. Code Ann. § 10-7-301(6). They suggest that this language encompasses any "information" which might be stored on a computer. The words and phrases of a statute must "draw their meaning from the context of the whole statute." *Winter v. Smith*, 914 S.W.2d 527, 538 (Tenn. App. 1995); *McClain v. Henry I. Siegel Co.*, 834 S.W.2d 295, 296 (Tenn. 1992). In context, this language follows an extensive list and reads as follows: "documents, papers, letters, maps, books, photographs, microfilms, electronic data processing files and output, films, sound recordings, or other material, regardless of physical form or characteristics ." Tenn. Code Ann. § 10-7-301(6). We find that, by following a list of different forms of organized information, this catch-all phrase is intended to ensure that the definition of "public record" will include <u>any</u> form or account of purposely compiled information regardless of whether it is in the list. However, this language does not extend the definition of "record" to the basic data which might make up such a collection of information.

In a recent case, *Seaton v. Johnson*, 898 S.W.2d 232 (Tenn. App. 1995), this court noted the distinction between information and records as it relates to requests made pursuant to § 10-7-503. The case involved a fatal collision between a car and a train, and the plaintiffs made a request pursuant to the Public Records Act that the Tennessee Department of Transportation provide them with certain "information" with regard to specified railroad crossings. *Id.* at 233. Included in the list of information sought by the plaintiffs were the following: 1) the average daily traffic; 2) the average daily freight train volume; 3) the average daily passenger train volume; 4) the maximum timetable speed; and 5) the accident history. *Id.*

The court stated that it was "hindered by the fact that both parties refer to the 'release of information' rather than 'the production of records for examination.'" *Id.* at 236. The information requested was contained in surveys, lists and data compiled in connection with a federally funded program for the purpose of identifying and evaluating the safety enhancement of railroad-highway crossings. *Id.* at 234. Federal law provided that "notwithstanding any other provision of law," these reports, surveys, schedules, lists, and data "shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data." *Id.* (quoting 23 U.S.C. § 409). Following federal authority, this court determined that the federal statute protects data as well as documents. In so holding, the court "observed that plaintiff's letter was not an assertion of the rights guaranteed by Section 10-7-503, but a request that the defendant search its records for a shopping list of information to be furnished to plaintiff." *Seaton*, 898 S.W.2d at 233 (emphasis added). Likewise, the Tennessean does not request records pursuant to § 10-7-503, but the information found within NES' existing records.

For additional support of its contention that the Public Records Act makes available "information," the Tennessean points to the code section which addresses the computer storage of records. Tenn. Code Ann. § 10-7-121 (Supp. 1996) provides as follows:

> (a)(1) Notwithstanding any other provision of law to the contrary, any information required to be kept as a record by any government official may be maintained on a computer or removable computer storage media, including CD ROM disks, instead of bound books or paper records if the following standards are met:
>
> (A) Such information is available for public inspection, unless it is a confidential record according to law; . . .
>
> (D) The official can provide a paper copy of the information when needed or when requested by a member of the public.

The thrust of this statute is that it authorizes the computer storage of records so long as certain conditions are met. The Tennessean emphasizes the fact that the statute uses the term "information." However, the statute initially refers to "information required to be kept as a record." *Id.* § 10-7-121(a)(1). Not only does this phrase further demonstrate the difference between information and records, but it evidences an understanding that the open records provision of Title 10, § 10-7-503(a), makes available "information required to be kept as a record" and not the information itself.

Returning to the statutory definition of "record" at issue here, we note that records are "made or received pursuant to law or ordinance or in connection with the transaction of official business by any governmental agency." § 10-7-301(6). The statute contemplates that the information or data which makes up a record has already been "made or received." Further, the record has been "made or received" in furtherance of some business purpose. It is not disputed that the names, addresses and phone numbers of NES customers have not yet been put into the form of a document. Moreover, both Mr. Hatridge and Mr. Wheeler testified that NES had never been in need of nor was it presently in need of such a document in order to conduct its business. In conclusion, the statutes at issue in this case are

- 11 -

unambiguous on their faces. It is clear that the General Assembly intended that records, and not the information of which they are compiled, be open to the public under § 10-7-503(a). We hold that the law can not be used to compel NES to create a record with the names, addresses and phone numbers of its customers when such a record has not already been "made or received" in connection with the business of NES.

Wisconsin's appellate court addressed an analogous situation in interpreting its own open records law.[3] In *George v. Record Custodian*, 485 N.W.2d 460 (Wis. App. 1992), a prison inmate made a request under Wisconsin's open records law for the "disclosure of data. He asked for the number of claims the [Department of Justice] received in 1988, 1989 and 1990, the number it settled without litigation as a direct result of notices of claims and the number it disallowed in the same period." *Id.* at 462. The inmate's request was denied "on grounds that the department had no document providing that information and the open records law does not require the creation of a new record by extracting information from existing records to satisfy a request." *Id.* The court agreed that Wisconsin's open records law "does not require the custodian to collect or compile statistics or create a record for the benefit of a requester." *Id.*

In holding as the Wisconsin appellate court did, this court notes the ramifications of a contrary holding -- that § 10-7-503(a) would require government agencies to compile new records from the information found in their existing records. It is reasonably foreseeable that such a holding would greatly strain the resources of often under-funded and under-employed government agencies. This court does not believe the legislature intended to impose such a burden. At the same time, we do

---

[3]Wisconsin's statute provides that "any requester has a right to inspect any record." Wis. Stat. § 19.35 (1996). "Record" is defined, in part, as "any material on which written, drawn, printed, spoken, visual or electromagnetic information is recorded or preserved, regardless of physical form or characteristics, which has been created or is being kept by an authority. 'Record' includes, but is not limited to, handwritten, typed or printed pages, maps, charts, photographs, films, recordings, tapes (including computer tapes), computer printouts and optical disks." *Id.* § 19.32(2).

not mean to preclude a government agency from voluntarily creating a record for the benefit of a requester. If an agency determines that it can manage the increased hardship caused by the creation of a record at the request of a certain party, then the reasons for refusing to impose the burden of mandatory compilation are eliminated.

## III.

The second issue raised on appeal is whether the Tennessee Public Records Act authorizes a governmental agency to charge members of the public who request access to public records the costs of notifying third parties that the requests have been made. As relates to NES, this issue is still relevant: the Tennessean can access the information it desires in the form of the existing records thereby calling into play NES' notification policy. As stated, the policy requires that notification be sent to citizens whose personal NES account information has been accessed by an unauthorized third party. In defending the legality of its records access policy, NES relies upon Tennessee Code Annotated § 10-7-506(a) (1992) which provides as follows:

> (a) In all cases where any person has the right to inspect any such public records, such person shall have the right to take extracts or make copies thereof, and to make photographs or photostats of the same while such records are in the possession, custody and control of the lawful custodian thereof or such custodian's authorized deputy; provided, the lawful custodian of such records shall have the right to adopt and enforce reasonable rules governing the making of such extracts, copies, photographs or photostats.

As the trial judge concluded, this issue hinges upon a determination of whether charging the Tennessean $86,400 for the cost of notification is a "reasonable rule governing the making of . . . copies." *Id.* In asserting that its notification policy is a reasonable rule under the statute, NES notes that, by requiring personal notification, the policy balances the public's right to access public records versus their right to protect themselves from the consequences of another person's access.

- 13 -

On the other hand, the Tennessean submits that this is a plainly incorrect misinterpretation of the Act in that the authority to adopt "rules" does not imply the authority to impose costs. In addition, the Tennessean asserts that the rule-making authority conferred by the Act relates to the making of copies of records, not to the auxiliary efforts to mitigate the effects of producing records. Finally, the Tennessean points to the provisions following § 10-7-506(a) found in § 10-7-506(c) which authorize the assessment of costs under narrow carefully defined conditions. It argues that this specific statute is superfluous if an agency has general authority to assess costs for any reasonable expenditure under subsection (a).

Initially, we reject the contention that the presence of the provisions for imposing costs found in § 10-7-506(c) supports the Tennessean's position. Indeed, we find that the language of subsection (c) is harmonious with NES' interpretation that § 10-7-506 authorizes the costs at issue. Section 10-7-506(c) applies only to records which include computer generated maps or other geographic data and which have commercial value. It states as follows:

> (c)(1) If a request is made for a copy of a public record that has commercial value, and such request requires the reproduction of all or a portion of a computer generated map or other similar geographic data that was developed with public funds, the legislative body of any county to which this subsection applies may establish and impose reasonable fees for the reproduction of such record, in addition to any fees or charges that may lawfully be imposed pursuant to this section. The additional fees authorized by this subsection may not be assessed against individuals who request copies of records for themselves or when the record requested does not have commercial value.

Tenn. Code Ann. § 10-7-506(c)(1)(1992). By its own terms, this subsection authorizes the imposition of fees in a very specific situation "in addition to any fees or charges that may lawfully be imposed pursuant to this section." *Id.* Regarding these additional fees authorized by § 10-7-506(c)(1), the statute provides the following:

> (2)     The additional fees authorized by this subsection shall relate to the actual development costs of such maps or geographic data and may include:
>
> (A)     Labor costs;
>
> (B)     Costs incurred in design, development, testing, implementation and training; and
>
> (C)     Costs necessary to ensure that the map or data is accurate, complete and current, including the cost of adding to, updating, modifying and deleting information.

*Id.* § 10-7-506(c)(2)(A)-(C).  Clearly, this provision is not intended to cover the costs for the copying or producing of the records.  However, the language contemplates that there may be other lawful "fees or charges . . . pursuant to this section."  *Id.* § 10-7-506(c)(1).  The only other portion of this section which could be read to authorize fees or charges is subsection (a)'s "right to adopt and enforce reasonable rules governing the making of . . . copies."  *Id.* § 10-7-506(a).  Therefore, we conclude that Tennessee Code Annotated § 10-7-506, when read in its entirety, indicates that the authority to " adopt . . . reasonable rules" does include the authority to impose costs.

As for the reasonableness of imposing costs for the notification of NES' customers, we begin by quoting the trial court's statement on reasonableness:

> "Reasonableness" is a touchstone of Anglo-American law. It is a concept which takes into account what is "just, proper, ordinary or usual, fitting and appropriate."  Black's Law Dictionary (4th ed. rev. 1968).  It is a concept which also demonstrates what is vibrant and brilliant about Anglo-American law, particularly the common law, and that is that "reasonableness" is a flexible concept which works for all times and all circumstances to be interpreted based thereon.

NES' notification policy was adopted in an effort to address the safety and privacy concerns associated with giving out the personal information of its customers.  As a dramatic example of the danger of not notifying a customer that his personal records have been accessed, NES presented an account of a man who allegedly used this information from NES to find his murder victim.  While we assume that requests motivated by intentions to inflict bodily harm will be scarce, it is clear that the Tennessean's request would include many phone numbers which are otherwise

unattainable as NES has collected both listed and unlisted numbers in order to install a system to cope with power outages. Notification would permit those who have unlisted numbers the opportunity to remove them from NES' records or, in the alternative, to change their numbers.

Providing the information requested by NES on 292,000 customers for a total fee of $91,619.00 amounts to only 31 cents per customer. We agree with the trial court that "[w]hile [the Tennessean] complains that the cost for it obtaining the information in issue is exorbitant, . . . the information it seeks is voluminous." We find that in light of the justifications presented for NES' notification policy, this policy represents a "just . . . and appropriate" rule. We hold therefore that, in adopting this policy, NES was within its "right to adopt and enforce reasonable rules governing the making of . . . copies." *Id.* § 10-7-506(a).

## IV.

Finally, we must determine whether the trial court's requirement for paying the costs of notification has become moot in light of the fact that, subsequent to the trial court's judgment, NES voluntarily notified its customers of the Tennessean's request in a monthly issue of *Power Notes*. By its language, the March 1996 issue of *Power Notes* did not notify the customers that the information was to be released as is required by the policy. Instead, the article explained that a request had been made, that the trial court had ruled that NES must provide the list of its customers at a cost, and that the Tennessean had failed to comply with the trial court's order with regard to paying the notification cost. It noted that the Tennessean might appeal the case and that unhappy customers should contact their state representatives and express their opinion that the state's public records law should be amended to exclude customers' personal information.

Even if the March 1996 issue of *Power Notes* failed to notify NES customers as required by the policy, the Tennessean submits that this article "demonstrates that NES can provide such notification virtually cost free through its routine billing procedures, thereby refuting [NES'] assertion that such notification can be made only at a cost of $86,400." However, the testimony of Ms. Robinson, an NES employee, was that *Power Notes* costs $5,128 to print and that adding an extra sheet to each mailing would add at least $82,000 for the excess postage. In addition, there would be expenses for the new machinery to process this extra sheet. It is clear that for NES such notification is not "virtually cost free." Moreover, Ms. Robinson and another employee, Ms. Corlew, testified that *Power Notes* is not set up for notifying NES customers when their personal records have been accessed. Due to the time it takes to draft, revise, print and mail each issue of *Power Notes*, information requested by the public could not be released for 60 days. Furthermore, the purpose of this publication is not served if NES is required to use it in this way.

Lastly, employees of NES testified that including the notification in *Power Notes* would not be as effective as notifying customer by a first-class letter because not all customers read *Power Notes*. As stated, NES presented a letter from a customer complaining that the material included with the bill was "junk mail." We agree that NES customers are much more likely to read a first class letter than a flyer which contains information about NES programs and services and non-profit community events. For the foregoing reasons, we conclude that NES should not be required to notify its customers pursuant to its notification policy by means of *Power Notes*.

In conclusion, we find that NES is not obligated under the Public Records Act to provide the information in the form requested by the Tennessean. However, should the Tennessean procure this information through existing records, it is reasonable for NES to require the Tennessean to bear the financial burden of

notifying NES' customers of the access by means of a first class letter as is NES' policy. The decision of the trial court is therefore reversed in part and affirmed in part and the cause is remanded to the Chancery Court of Davidson County for any further proceedings that might become necessary. Tax the costs on appeal to the appellant.

_____
BEN H. CANTRELL, JUDGE

CONCUR:

_____
SAMUEL L. LEWIS, JUDGE

_____
WILLIAM C. KOCH, JR., JUDGE