IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
December 15, 2000 Session

## MEMPHIS PUBLISHING CO., ET AL. v. CHEROKEE CHILDREN & FAMILY SERVICES, INC., ET AL.

Appeal from the Chancery Court for Shelby County
No. CT-002141-00    John R. McCarroll, Jr., Chancellor

No. M2000-01705-COA-R3-CV - Filed March 15, 2001

The publisher and assistant managing editor of *The Commercial Appeal*, a Memphis newspaper, sued a non-profit corporation seeking access to the corporation's books and records under the Tennessee Public Records Act. The Circuit Court of Shelby County held that the corporation's contract with the State made virtually all of its records State property. We reverse the judgment of the trial court and reject the appellee's alternative argument that the corporation is a State agency. Therefore the appellee is not entitled to free access to the corporation's records.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which WILLIAM C. KOCH, JR. and WILLIAM B. CAIN, JJ., joined.

Allan J. Wade, Lang Wiseman, Lori Hackleman Patterson, Memphis, Tennessee, for the appellant, Cherokee Children & Family Services.

Lucian T. Pera, Kathy Laughter Laizure and Brian S. Faughnan, Memphis, Tennessee, for the appellee, Memphis Publishing Company and Mike Kerr.

## OPINION

### I.

Cherokee Children and Family Services, Inc., a non-profit corporation located in Shelby County, contracted with the State Department of Human Services (DHS) to help administer a state-subsidized daycare program. All of Cherokee's employees were engaged in performing work under the contract with DHS, and over 99% of Cherokee's revenue came from government sources.

Starting in 1990 the State compensated Cherokee by reimbursing the company for expenses incurred. The contract in effect from 1992 to 1999 significantly changed the payment program by providing that Cherokee would be paid a percentage of the funds DHS paid to daycare centers for Cherokee-placed children. From January 1, 2000 to August 21, 2000, the parties operated under a third contract that reverted to the cost reimbursement plan.

In the fall of 1999, *The Commercial Appeal* became interested in Cherokee's operation and asserted a right to see their books and records under the Public Records Act, Tenn. Code Ann. § 10-7-101, et seq. Despite some extended negotiations and several unfulfilled promises by Cherokee to furnish some of its records, the plaintiff filed this action on March 27, 2000, seeking to inspect and copy the following records:

a.     All rental agreements, leases, receipts of payments and other records related to any rental arrangements between Cherokee and Affordable Homes;

b.     All receipts, invoices, contracts, and other records pertaining to any and all professional and/or consulting fees paid by Cherokee since January 1, 1995;

c.     Records documenting any and all payments to officers and directors of Cherokee since January 1, 1997;

d.     All records, including without limitation invoices, receipts, and expense reports, documenting expenses for travel, conferences, conventions, meetings and meals since January 1, 1995, incurred and/or paid by Cherokee, as reflected in Cherokee's annual form 990 reports filed with the Internal Revenue Service;

e.     All invoices, receipts, and other records detailing and documenting any or all "contributions identified or listed in Cherokee's annual form 990 reports to the Internal Revenue Service from January 1, 1995, to the present;

f.     All canceled checks and monthly statements involving all bank accounts maintained by Cherokee, covering the period of January 1, 1995, to the present;

g.     All invoices, receipts and any other records documenting or pertaining to rents paid by Cherokee from January 1, 1995, to the present; and

h.     All contracts, consulting agreements, leases, retainers or other binding agreements entered into by Cherokee from January 1, 1990 to the present.

The complaint asserted that Cherokee's contract with the State made all the company's records public records, and in addition, that because of the services it performed, Cherokee was in fact a State agency.

The Circuit Court of Shelby County held that Cherokee was an independent contractor and not a State agency. But the court found that the specific language of the 1992 contract (which was in effect until January 1, 2000) made all records, files, and documentation held by Cherokee public records under Tenn. Code Ann. § 10-7-503(a).

## II.
### THE CONTRACT PROVISIONS

The 1992 contract in its Standard Terms and Conditions contained the following sections:

E7. The Contractor shall maintain documentation for all charges against the State under this Contract. The books, records and documents of the contractor, insofar as they relate to work performed or money received under this Contract, shall be maintained for a period of three (3) full years from the date of the final payment, and shall be subject to audit, at any reasonable time and upon reasonable notice, by the State agency or the Comptroller of the Treasurer or their duly appointed representatives. These records shall be maintained in accordance with generally accepted accounting principles.

. . . .

In a section called Special Terms and Conditions the contract stated:

F1. Should any of these special terms and conditions conflict with any other terms and conditions of this Contract, these special terms and conditions shall control.

. . .

F5. All records, files and documentation held in the custody of the Contractor shall be considered to be the property of the State. In the event of termination, such records should be made available to the State, in good condition, within 10 working days of termination.

Tenn. Code Ann. § 10-7-503(a) provides that all state, county, and municipal records shall at all times during business hours be open for inspection by any citizen of Tennessee. The plaintiffs argue that Section F.5 of the contract makes all of Cherokee's records state property.

In isolation, Section F.5 seems to make all of Cherokee's records the State's property; especially when Section F.1 resolves any conflict with the other terms and conditions in favor of those contained in Section F. But we are not dealing with conflicting provisions. We are searching for the meaning of the "all records, files and documentation" provision in F.5.

The meaning of a contract is a question of law, *Realty Shop, Inc. v. RR Westminister Holding, Inc.*, 7 S.W.3d 581 (Tenn. Ct. App. 1999), and a trial court's interpretation is reviewed de novo in this court without the presumption of correctness that attaches to the lower court's findings of fact under Rule 13(d), Tenn. R. App. P. *Nutt v. Champion International Corporation*, 980 S.W.2d 365 (Tenn. 1998). Our goal is to give effect to the parties' intentions. *Bob Pearsall Motors, Inc. v. Regal Chrysler Plymouth, Inc.* 521 S.W.2d 578 (Tenn. 1975). The search for that elusive intent should

focus on the four corners of the contract and the circumstances existing at the time the contract was formed. *Realty Shop, Inc. v. RR Westminister Holding, Inc.*, 7 S.W.3d 581 (Tenn. Ct. App. 1999). "No single clause in a contract is to be viewed in isolation; rather the contract is to be 'viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illuminate another.'" *Frizzell Construction Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79 at 85 (Tenn. 1999)(citing *Cocke Co. Bd. of Highway Commissioners v. Newport Utilities Bd.*, 690 S.W.2d 231 (Tenn. 1985)). All provisions of a contract should be construed in harmony with each other. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88 (Tenn. 1999). The court's objective should be to choose that construction that will render all parts of the entire agreement enforceable. *Rainey v. Stansell*, 836 S.W.2d 117 (Tenn. Ct. App. 1992).

The 1992 contract should be viewed with the following facts and circumstances in mind. Cherokee filed its charter with the Secretary of State on December 22, 1989 as a not for profit corporation with the following purposes:

(a)     To provide comprehensive social service for young people from infancy through nineteen (19) years of age who are teenage mothers, handicap children, under-achievers in school and special-problem children.

(b)     To mobilize and utilize resources, both public and private; to offer continuous and progressively comprehensive social services appropriate to our target group or clientele.

(c)     To do anything necessary and proper for the accomplishment of the foregoing purpose and goals, provided same is not inconsistent with the laws of the State of Tennessee and the United States of America.

On April 19, 1990, the corporation amended its charter as follows:

The purpose of CCFS is to provide transitional child care services for children of low-income families referred by the Department of Human Services. Funds for this project are provided by Federal and State block grants which are used for tuition payments and administrative expenses.

The services provided by CCFS include listing and classification of child care providers, referrals of qualified families to appropriate child care centers, and the monitoring and supervision of each placement under guidelines provided by DHS. Upon the dissolution of Cherokee Children and Family Services, all remaining assets will be returned to the Federal and State offices which supplied the original grants.

Cherokee's Executive Director testified that the company was created to administer programs for low-income families. Part of that goal was fulfilled under the contract with DHS. In addition the company assists in training day care providers for goodwill purposes. The company was not

created to contract with the State, but about six months after its formation the company entered into the 1990 contract with DHS.

Against that background, and with the construction rules in mind, the several provisions of the contract pertaining to its books and records come into focus. Section E.7 requires Cherokee to maintain <u>documentation</u> for all charges against the State and to maintain for a period of three years the <u>books</u>, <u>records</u>, and <u>documents, insofar as they relate to work performed or money received under the contract</u>. Section F.5 says that all <u>records</u>, <u>files</u> and <u>documentation</u> held by Cherokee shall be considered to be the property of the State and should be made available to the State within ten working days if the contract is terminated.

In our opinion the provisions in F.5 refer back to the things described in E.7; that is, records related to work performed or money received under the contract. This is the only interpretation that gives effect to all the contract provisions. We think it is significant that the words are almost the same. Section E.7 refers to "documentation," "books," "records," and "documents." Section F.5 refers to "records," "files," and "documentation." The only differences are "books" in E.7, referring to charges for work performed or money received under the contract, and "files" in F.5, the turnover provision. If F.5 stood alone as an additional requirement, E.7 would have no meaning. Why would the State need to reserve the right to audit their own records? Why could Cherokee destroy public records after three years, when there are statutes and regulations that govern the destruction of other public records?

Our interpretation also avoids the extremes that would result from the plaintiff's interpretation of F.5. Under that interpretation, Cherokee's charter, by-laws, and corporate minutes are State property; its bank records, including certificates of deposit, and any other securities, documents of title, or written evidence of debts would be subject to the State's demand. Disciplinary acts against employees and other sensitive information concerning third parties would be subject to disclosure as a public record. While Cherokee is a not for profit corporation it is still a separate entity, subject to being sued and obligated to defend itself when it is under assault.

Cherokee came into existence before it started doing business with the State. Its purposes are to do good works in general. The Executive Director testified that it performed some charitable works outside of its contract with the State. Under the plaintiff's interpretation of the contract, all records pertaining to the pre-1990 activities and the records of activities separate from the work it did under contract with the State would belong to the State. We think the most reasonable interpretation of the agreement is that the State is only entitled to Cherokee's books, records, and documentation insofar as they relate to the work performed or money received under the contract. How Cherokee handles its funds after they are received from the State may have some bearing on its status as a not for profit corporation, but records pertaining to its use of its funds are not State records under the 1992 contract.

### III.
### IS CHEROKEE A STATE AGENCY?

The plaintiffs have insisted from the beginning that because of Cherokee's "close and pervasive" relationship with the State, Cherokee is actually a State agency. The plaintiffs cite as persuasive the facts we have previously cited in this opinion; i.e. that all of Cherokee's employees were engaged in performing the DHS contract and 99% of its revenue came from government sources. In addition, many of the same employees actually work out of the DHS office.

On this issue, the plaintiffs bear the burden of proof, *Memphis Publishing Co. v. Shelby County Healthcare Corp.*, 799 S.W.2d 225 (Tenn. Ct. App. 1990), and we concur with the trial judge's finding that they have failed to carry that burden. The facts recited do not lead inevitably to a conclusion that Cherokee is an arm of the State, and there are other facts that lead to the opposite conclusion. In their contracts, the parties took pains to separate Cherokee from the State by providing that Cherokee was an independent contractor required to carry its own insurance, and that the State incurred no liability from Cherokee's operations. In *Memphis Publishing* the court held that similar facts were important factors in the analysis. 799 S.W.2d at 230. In addition the *Memphis Publishing* court distinguished the Shelby County Healthcare Corporation from the hospital that was the subject of a successful public records demand in *Cleveland Newspapers, Inc. v. Bradley County Memorial Hospital*, 621 S.W.2d 763 (Tenn. Ct. App. 1981). The "public" hospital in *Bradley County* was created by the legislature; in contrast the non-public entity in *Memphis Publishing* was incorporated pursuant to the Tennessee General Corporation Act as a private non-for-profit-corporation. The Bradley County Hospital claimed the State's immunity from tort actions, while the Memphis Hospital did not. Cherokee is more like the private corporation in *Memphis Publishing.*

The plaintiffs also place great weight on this court's decision in *Creative Restaurants v. City of Memphis*, 795 S.W.2d 672 (Tenn. Ct. App. 1990), where we held that leases of city property in the possession of the city's leasing agent and a city attorney were public records. The difficulty in that case, however, was in sorting out the relationship between the various entities interposed between the city and the ultimate lessees. Once the court concluded that the management company handling the leases was simply the city's agent, the result naturally followed. Public records may be inspected even though they are in the hands of an agent. *Board of Education v. Memphis Publishing Company*, 585 S.W.2d 629 (Tenn. Ct. App. 1979). Since we have concluded that many of the records sought by the plaintiffs are not public records and that Cherokee is an independent contractor, *Creative Restaurants* is inapplicable to this case.

The judgment of the lower court is reversed in part and affirmed in part and the cause is remanded to the Circuit Court of Shelby County for further proceedings in accordance with this opinion. Tax the costs on appeal to the appellees, Memphis Publishing Company and Mike Kerr.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.